IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 95-50582
_____


DIANE PIERCE,

                                        Plaintiff-Appellee,

        versus

DAVID SMITH; LOUIS BINDER,

                                        Defendants-Appellants,

        and

TEXAS TECH UNIVERSITY HEALTH
SCIENCE CENTER,

                                        Defendant.


_____

Appeal from the United States District Court for the
                Western District of Texas
_____

July 15, 1997

Before GARWOOD, BARKSDALE, and DENNIS, Circuit Judges.

GARWOOD, Circuit Judge:

        Plaintiff-appellee Dr. Diane Pierce (Dr. Pierce) brought this

suit against defendants-appellants Dr. David Smith (Dr. Smith) and

Dr. Louis Binder (Dr. Binder), claiming that appellants violated

her rights under the Fourth and Fourteenth Amendments when they, as

officials of the state medical residency program in which she was

enrolled, caused her to undergo a private urinalysis test for drugs

and submit the test results to program officials, by informing her

that she would be expelled from the program if she was not tested.

The jury returned a verdict in favor of Dr. Pierce, awarding her compensatory and punitive damages. Dr. Smith and Dr. Binder appeal. We hold appellants are protected by qualified immunity and accordingly reverse.

## Facts and Proceedings below

Dr. Pierce was a medical resident in the emergency medicine residency program at the Texas Tech University Health Science Center (TTUHSC) in El Paso, Texas, from 1988 to 1991. Texas Tech is a state institution. As part of her TTUHSC residency program, Dr. Pierce served a two-month rotation at St. Joseph's Hospital in Phoenix, Arizona, during January and February of 1990, where she trained with the trauma team in emergency medicine.

On February 22, 1990, a patient was admitted to the St. Joseph's emergency room with head injuries sustained after smashing his head through the windshield of his car in an automobile accident. The patient, who was under the influence of alcohol and drugs, was extremely uncooperative and aggressive.

Dr. Dale Stannard, the attending physician on the emergency service that day, ordered that a CAT scan be performed to determine whether the patient had suffered any internal head injury. Hospital orderlies brought the patient to the CAT scan room and placed him on the scan table. As part of the trauma team, Dr. Pierce was called to the CAT scan room to see the patient. When she arrived, she noticed that the orderlies were having difficulty restraining the patient on the table. Dr. Pierce tried to help and as she leaned over the patient to tighten his restraints, he spat in her face. Dr. Pierce, in her words, "hard slapped" the patient

2

at least two times on his face.

Dr. Pierce, the only physician present, left the room to wash off the saliva. When she returned, the nursing supervisor forcefully escorted her out of the room, telling her to stay away from the patient. Dr. Stannard, who was not present in the CAT scan room when the incident occurred, was told by the night supervisor that Dr. Pierce had "karate chopped" the patient. Later on, however, Dr. Stannard learned that Dr. Pierce had actually slapped the patient. He believed that there was no cause to discipline her.

The following day, Dr. Pierce was called in to see Dr. Raymond Shamos, the acting trauma director at St. Joseph's. The administrators at St. Joseph's were upset by the incident and wanted to promptly send Dr. Pierce back to TTUHSC in El Paso. Dr. Shamos, however, felt such steps were unnecessary and instead instructed Dr. Pierce to seek counseling with St. Joseph's employee counseling administrator. She underwent counseling and was allowed to finish the remaining three days of her rotation at St. Joseph's. The counselor recommended that on her return to El Paso Dr. Pierce "contact the University Psychiatric department to continue counseling sessions."

Dr. Smith, the residency director at TTUHSC at the time, learned of the incident through Pat Jones, the emergency medicine department administrator, who told Dr. Smith that Dr. Pierce had "beat up a patient" at St. Joseph's. Dr. Smith began his own investigation of the incident, which included talking with Dr.

Brian Nelson, who was chairman of the faculty at TTUHSC, and Dr. Shamos. During Dr. Smith's telephone conversation with Dr. Shamos, Dr. Smith was told that Dr. Pierce had karate chopped the patient in the neck. Later, Dr. Smith met with Dr. Binder, Associate Professor in the Department of Emergency Medicine at TTUHSC and Assistant Dean, to discuss the incident. Due to incorrect information received from St. Joseph's, both Dr. Smith and Dr. Binder thought that Dr. Pierce had karate chopped a patient and had to be physically restrained from the patient. They discussed a number of possible explanations for Dr. Pierce's surprising behavior, including drug use.

Upon Dr. Smith's request, Dr. Pierce met with Dr. Smith in his office on February 28. At that meeting, Dr. Smith handed Dr. Pierce a letter and told her that she was being placed on probation, with pay, pending an investigation into the incident.

This was not the first time Dr. Pierce had been on probation in her TTUHSC residency. During the summer of 1989, she was placed on probation for, among other reasons, excessive tardiness, poor interpersonal relationship problems with the faculty and patients, and failing to carry an acceptable volume of patients. At that time (in 1989), there was some discussion among the faculty members that drug use might be the cause of Dr. Pierce's behavior. When asked during 1989 by Dr. Nelson whether she was using drugs, Dr. Pierce replied that she was not. Dr. Pierce was eventually taken off this probation, and was not on probation when she slapped the patient at St. Joseph's.

4

Dr. Smith also told Dr. Pierce in the February 28 meeting that she would have to undergo psychiatric evaluations. On March 2, Dr. Smith met with Dr. Pierce again, and told her that she would be required to undergo two psychiatric evaluations. One evaluation would be performed by a doctor selected by TTUHSC and the other evaluation by a doctor selected by Dr. Pierce.

On that same day, Dr. David Smith contacted Dr. Robert Smith about performing the evaluation on Dr. Pierce on behalf of TTUHSC. Dr. Robert Smith agreed to do so. Dr. David Smith understood that the evaluation would include a urine drug test.

Dr. David Smith met with Dr. Pierce for a third time on March 9. Dr. Pierce handed to Dr. Smith letters written by Dr. Stannard and Dr. Shamos on her behalf, describing their accounts of what had happened at St. Joseph's and, specifically, correcting earlier stories that Dr. Pierce had karate chopped the patient and explaining that Dr. Pierce instead had slapped the patient three times on the face. Dr. Smith brought these letters to the attention of Dr. Binder and Dr. Nelson. However, the letters did not cause the doctors to rule out drug use as a possible explanation for Dr. Pierce's conduct.

Dr. Pierce arrived at Dr. Robert Smith's office on March 14 to undergo her psychiatric evaluation. At that time, she was informed by Dr. Robert Smith that he had scheduled a urinalysis drug test for their next appointment on March 17. Dr. Pierce objected to taking the drug test, and went to speak with Dr. David Smith, informing him of her objection to the urinalysis. Dr. David Smith

5

told her that he would bring the matter of the urinalysis up with the faculty on March 20.[1] Dr. Pierce met with Dr. Robert Smith on March 17, and she told him she would likely refuse to take the urinalysis test. Dr. Pierce next met with Dr. David Smith on March 19. Dr. Pierce testified that on this occasion Dr. David Smith told her "if I didn't take the urinalysis test, I'd be dismissed" and "indicated that he had to be able to prove to Dr. Nelson [TTUHSC faculty chairman] and Dr. Glass [a faculty member] that I wasn't using drugs." Dr. Pierce did not indicate she would submit to urinalysis, but did not definitely say she would not.

Nothing in the record suggests that either Dr. David Smith or Dr. Binder, alone or in combination with each other, had or claimed to have the authority to actually dismiss Dr. Pierce. The only matter in the record speaking to this is the "Personnel Relations & Disciplinary Action" attachment to the TTUHSC Graduate Medical Education Program Agreement between TTUHSC and Dr. Pierce for the period July 1, 1989, to June 30, 1990. This attachment provides that the Program Director has the authority to recommend dismissal to the dean of the Texas Tech medical school, "through" the TTUHSC dean, who in 1990 was Dr. Joseph Brown (to whom Dr. Binder reported), "for review and action." It also provides that a resident has the right to appeal a dismissal, with attendant due process rights, and that compensation and benefits shall continue,

---

[1]  A faculty meeting took place on March 20. It is unclear from the record what transpired at this meeting; however, it does not appear that the faculty officially approved or disapproved of the urinalysis.

and certifying boards and medical associations shall not be notified of the dismissal, during the appeal process.

Although she still would not commit to take Dr. Robert Smith's urinalysis test, on March 23 Dr. Pierce decided to take a urinalysis drug test at an independent laboratory, Pathlab. After receiving the results, which were negative, from the laboratory, Dr. Pierce hand-delivered the report to Dr. David Smith on March 30, which he accepted in place of the urinalysis which had been arranged for by Dr. Robert Smith. The evidence indicates, and there is no evidence to the contrary, that prior to receiving this report neither Dr. David Smith nor Dr. Binder nor anyone else at TTUHSC (nor Dr. Robert Smith) had any indication that Dr. Pierce intended to take (or had taken) a urinalysis drug test, independently or otherwise. On that same day, after reviewing the urinalysis report and the psychiatric evaluations of Dr. Robert Smith and Dr. Ann Salo,[2] Dr. David Smith took Dr. Pierce off her probation.

There is evidence that at some point after Dr. David Smith first learned of the Phoenix incident and before March 20, but just when is totally unclear, Dr. Binder recommended to Dr. David Smith that Dr. Pierce undergo a drug test.

On February 24, 1992, Pierce filed this suit against Dr. David Smith and Dr. Binder, seeking damages and declaratory relief pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201 and the Fourth and

---

[2]     Dr. Pierce selected Dr. Salo, a clinical psychologist, to conduct the second psychiatric evaluation.

Fourteenth Amendments to the United States Constitution. Her claims included (1) taking of a property right without due process of law by virtue of the suspension from her residency program; (2) taking of a liberty interest by virtue of an unreasonable search of her person; (3) violation of her right to equal protection by virtue of her gender; and (4) intentional infliction of emotional distress. The complaint was later amended to add TTUHSC as a defendant, claiming that TTUHSC violated Dr. Pierce's rights under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681-1688 (Title IX).

All defendants moved for summary judgment. The court granted the defendants' motion on all claims except the Fourth Amendment claim and the claim for intentional infliction of emotional distress. The court refused to dismiss the complaint on summary judgment against the individual defendants on the basis of qualified immunity.

The defendants then filed their answer, again raising the affirmative defense of qualified immunity as to the individual defendants. Two days later, the court permitted the defendants to supplement their earlier motion for summary judgment as to the remaining claims. The court granted the defendants' motion on the intentional infliction of emotional distress claim, but denied summary judgment on the Fourth Amendment claim.

Over the defendants' objections, the district court submitted a jury instruction stating that, before a government employer may compel an employee to undergo a drug test, the employer must have

8

individualized suspicion that the employee was using drugs. The jury returned a verdict in favor of Dr. Pierce, awarding her $30,000 actual damages against Dr. Smith and Dr. Binder, jointly and severally; $10,000 punitive damages against Dr. Smith; and $10,000 punitive damages against Dr. Binder.

The district court overruled the defendants' motions for judgment as a matter of law or for a new trial, and entered final judgment on the verdict. The court also awarded Dr. Pierce $31,153.41 in attorney's fees and expenses and $2,770.82 court costs. Dr. Smith and Dr. Binder bring this appeal.[3]

**Discussion**

I. Qualified Immunity; Standards and Review

Appellants argue on appeal that, as government officials, they are entitled to qualified immunity.[4]

A state official exercising discretionary authority whose conduct deprives another of a right secured by federal constitutional or statutory law is nonetheless shielded from personal liability for damages under section 1983 by the doctrine of qualified immunity, unless at the time and under the circumstances of the challenged conduct all reasonable officials would have realized that it was proscribed by the federal law on

---

[3]   We address only Dr. Pierce's Fourth Amendment claim against Dr. Smith and Dr. Binder as she does not challenge the district court's dismissal of her other claims.

[4]   The failure to take an interlocutory appeal from the denial of a pretrial motion to dismiss or for summary judgment does not waive the defense of qualified immunity. *Matherne v. Wilson*, 851 F.2d 752, 756 (5th Cir. 1988). *See also Spann v. Rainey*, 987 F.2d 1110, 1114 (5th Cir. 1993).

which the suit is founded. *See, e.g., Anderson v. Creighton*, 107 S.Ct. 3034, 3038-3040 (1987). In order for qualified immunity to be unavailable, at the time the challenged action occurred the federal law proscribing it must have been clearly established not only as an abstract matter but also "in a more particularized . . . sense" such that "[t]he contours of the right" are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id*. at 3039. For example, where the complained of conduct is a law enforcement warrantless search of a residence, qualified immunity turns not only on whether it was then clearly established that such a search required probable cause and exigent circumstances, but *also* on whether it was then "clearly established that the circumstances with which" the officer "was confronted did not constitute probable cause and exigent circumstances." *Id*. Qualified immunity protects "'all but the plainly incompetent or those who knowingly violate the law.'" *Hunter v. Bryant*, 112 S.Ct. 534, 537 (1991) (quoting *Malley v. Briggs*, 106 S.Ct. 1092, 1096 (1986)).[5]

---

[5] In a section 1983 suit, the relevant law addressed for this purpose is only the federal law the asserted violation of which provides the basis for the claim sued on. In *Davis v. Scherer*, 104 S.Ct. 3012, 3018-20 (1984), the Supreme Court rejected the proposition that conduct which violates the clear command of a state statute or regulation is not "'objectively reasonable'" and hence may not be shielded by "qualified immunity" in a section 1983 action. *Davis* makes plain that the "objective reasonableness" inquiry in section 1983 qualified immunity cases is addressed only in respect to the federal constitutional right allegedly violated. *Id*. at 3019. The Court went on to observe that "[n]either federal nor state officials lose their immunity by violating the clear command of a statute or regulation—of federal or state law—unless that statute or regulation provides the basis for the cause of action sued upon." *Id*. n.12.

10

The issue of whether and when a right is clearly established is typically treated as a question of law. *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1183 (5th Cir. 1990). Likewise, to the extent that the relevant discrete, historic facts are undisputed, as they essentially are here, the question of the objective reasonableness of the defendant's conduct—*i.e.*, whether at the time and under the circumstances all reasonable officials would have realized the particular challenged conduct violated the constitutional provision sued on—is also a question of law. *Mangieri v. Clifton*, 29 F.3d 1012, 1015-1016 (5th Cir. 1994). *See also Hunter* at 536-37 (whether under the circumstances a reasonable officer could believe probable cause for arrest existed, thus giving rise to qualified immunity, is a question of law); *Blackwell v. Barton*, 34 F.3d 298, 305 (5th Cir. 1994); *United States v. Basey*, 816 F.2d 980, 988 (5th Cir. 1987) (reasonable suspicion).

Where, as here, a section 1983 defendant pleads qualified immunity and shows he is a governmental official whose position involves the exercise of discretion, the plaintiff then has the

---

Moreover, because the issue is one of *objective* reasonableness in respect to whether the challenged action violated the constitutional provision sued on, the defendant's subjective motivation and subjective belief as to the lawfulness of his conduct or what facts justified it are irrelevant. *Anderson* at 3040 ("Anderson's subjective beliefs about the search are irrelevant"); *Mangieri v. Clifton*, 29 F.3d 1012, 1017 (5th Cir. 1994) ("The subjective beliefs of [the officer-defendants] as to what facts they relied upon in forming the probable cause to arrest [plaintiff] are irrelevant to the objective reasonableness of their actions"); *Pfannstiel v. City of Marion*, 918 F.2d 1178, 1187 (5th Cir. 1990) ("even an officer who subjectively intends to act unreasonably is entitled to immunity if his actions are objectively reasonable").

burden "to rebut this defense by establishing that the official's allegedly wrongful conduct violated clearly established law." *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). We do "not require that an official demonstrate that he did not violate clearly established federal rights; our precedent places that burden upon plaintiffs." *Id.*

In *Siegert v. Gilley*, 111 S.Ct. 1789 (1991), the Court stated that in a qualified immunity case, "the first inquiry" is whether the plaintiff has "failed to allege the violation of a clearly established constitutional right." *Id*. at 1793. Accordingly, as explained in *Meadowbriar Home for Children, Inc. v. Gunn*, 81 F.3d 521, 530 (5th Cir. 1996):

> "'In assessing qualified immunity, we engage in a two-step analysis. First, we determine whether a plaintiff has alleged the violation of a clearly established constitutional right under the current state of the law.' *R.A.M. Al-Ra'id v. Ingle*, 69 F.3d 28, 31 (5th Cir. 1995). 'Second, if the plaintiff has alleged such a constitutional violation, we decide whether this defendant's conduct was "objectively reasonable," measured by reference to the law as clearly established at the time of the challenged conduct.' *Id*. at 31 (internal citations omitted)."

The first step will generally involve analysis at a higher level of generality than the second, which focuses not only on the state of the law at the time of the complained of conduct, but also on the particulars of the challenged conduct and/or of the factual setting in which it took place. Thus, for example, in an arrest case the first step may be satisfied by finding that the law is (and was) clearly established in requiring probable cause; at the second step, we assess whether the defendant, under the particular

12

circumstances, could have reasonably concluded that probable cause was present. *See, e.g., Hunter; Anderson; Blackwell.* In none of these cases was there any relevant change in the law between the complained of conduct and the court's decision; and, these decisions plainly authorized denial of relief on the basis of qualified immunity without ultimately determining whether a constitutional violation in fact occurred.[6]

II.  Fourth Amendment

A.  Search

The Fourth Amendment, applicable to the states by virtue of the Fourteenth Amendment, forbids governmental violation of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, . . . ." The Supreme Court has held that this guarantee extends to searches and seizures not only by law enforcement authorities, but also by government officials who conduct various civil activities. *See,*

---

[6]  Likewise, in *Gunaca v. State*, 65 F.3d 467 (5th Cir. 1995), a suit by an investigator for a district attorney's office alleging he was dismissed because of his political preferences contrary to the First Amendment, we held the first step was satisfied by Supreme Court decisions establishing that "the practice of patronage dismissals 'clearly infringes First Amendment interests,'" *id*. at 473, and then held at the second step that the defendant was entitled to qualified immunity because it was also established that there was "a class of public employees . . . whose First Amendment interests are outweighed by a governmental interest in the employees' political loyalty," but "neither the Fifth Circuit nor the Supreme Court had addressed the issue of political patronage in the hiring or firing of investigators in district attorneys' offices, and neither had addressed an issue sufficiently analogous." *Id*. at 474, 475. We resolved only the issue of qualified immunity, not whether there was in fact a constitutional violation. Again, there was no change in the relevant law between the time of the complained of conduct and this Court's decision.

13

*e.g.*, *O'Conner v. Ortega,* 107 S.Ct. 1492, 1496 (1987) (state hospital officials); *New Jersey v. T.L.O.*, 105 S.Ct. 733, 739-40 (1985) (school officials).

It is clear that, under certain circumstances, the collection and testing of urine by the government constitutes a search subject to Fourth Amendment constraints. *Chandler v. Miller*, 65 U.S.L.W. 4243 (April 15, 1997); *Vernonia School District 47J v. Acton*, 115 S.Ct. 2386 (1995); *Skinner v. Railway Labor Executives' Ass'n*, 109 S.Ct. 1402, 1413-14 (1989); *Treasury Employees v. Von Raab*, 109 S.Ct. 1384, 1390 (1989); *Aubrey v. School Bd. of Lafayette Parish*, 92 F.3d 316, 318 (5th Cir. 1996).[7]

    B.    Non-law enforcement standards generally; Individualized suspicion

As the Supreme Court said in *Skinner*, "to hold that the Fourth Amendment is applicable to" the instant drug test:

> "is only to begin the inquiry into the standard governing such intrusions. [citations] For the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. [citations] What is

---

[7] In *Chandler*, the Supreme Court held that the Fourth Amendment proscribed a state statute which conditioned ballot eligibility on the candidate's having undergone a urine test showing the absence of drugs, notwithstanding that the urine sample could be provided in the office of the candidate's private physician and the test results were first given the candidate, who controlled further dissemination. It might be argued that *Chandler*'s holding that the test taken there was one subject to Fourth Amendment constraints is inapplicable here because, in contrast to the *Chandler* situation, the private test Dr. Pierce underwent, and her disclosure to Dr. Smith of its negative results, was not something that Dr. Smith, or any other state official, had called for or anticipated (and Dr. Pierce was not disciplined for failure to undergo the drug test called for by Dr. Smith; nor did Dr. Smith or Dr. Binder have authority to dismiss Dr. Pierce). We do not resolve this possible question, but rather assume, *arguendo*, that Dr. Pierce actually underwent a search subject to Fourth Amendment constraints.

reasonable, of course, 'depends on all of the circumstances surrounding the search or seizure and the nature of the search or seizure itself.' [citations] Thus, the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.' [citations]" *Id*. at 1414.

"In most criminal cases" this balancing of interests is struck "in favor of the procedure described by the Warrant Clause of the Fourth Amendment." *Id*. However, "where a Fourth Amendment intrusion serves special governmental needs, beyond the normal need for law enforcement" a more particularized balancing is necessary to determine reasonableness and "neither a warrant nor probable cause, nor, indeed, any measure of individualized suspicion, is an indispensable component of reasonableness in every circumstance." *Von Raab* at 1390. As the Court recently said in *Chandler*, although Fourth Amendment reasonableness "ordinarily must be based on individualized suspicion of wrongdoing," nevertheless "exceptions to the main rule are sometimes warranted based on 'special needs, beyond the normal need for law enforcement' [citing *Skinner* at 1414]. When such 'special needs'—concerns other than crime detection—are alleged in justification of a Fourth Amendment intrusion, courts must undertake a context-specific inquiry, examining closely the competing private and public interests advanced by the parties." *Id*. at 4245-46.[8] *Cf*. Akhil R. Amar, *Fourth Amendment First Principles,* 107 Harv. L. Rev. 757, 784 n.100

---

[8] We note, however, that even in certain crime detection contexts, the Court has found "special needs" obviating the necessity for individualized reasonable suspicion. *See, e.g., Michigan Department of State Police v. Sitz*, 110 S.Ct. 2481 (1990).

(1994) (". . . individualized suspicion makes sense as a prerequisite for warrants, but it does not make sense as the test for all searching and seizing—outside the criminal context, for example").

C. Special needs situations

"Special needs" for these purposes have been found in a variety of circumstances, including "[t]he Government's interest in regulating the conduct of railroad employees to ensure safety . . . its supervision of probationers or regulated industries, . . . [and] its operation of a government office . . . [or] school." *Skinner* at 1415. And in *Von Raab* such a "special need" was found respecting drug testing of Customs Service employees who would be required to either carry firearms or engage in drug interdiction, the Court observing "the Government's need to discover such latent or hidden conditions, or to prevent their development, is sufficiently compelling to justify the intrusion on privacy entailed by conducting such searches without *any measure* of individualized suspicion." *Id*. at 1392 (emphasis added). This was so despite the fact that there was "no perceived drug problem among Customs employees." *Id*. at 1395.

On the other hand, it is clear that where the "need" is in essence simply "symbolic"—the desire to "project" a public "image"—it is not a "special" need for these purposes. *Chandler* at 4248.

Plainly, this *is* a "special needs" case. It is clear that the instant challenged search was "not designed to serve the ordinary

16

needs of law enforcement," *Von Raab* at 1391, and no law enforcement personnel were in any way involved.  The present setting not only involves the practice of medicine, an endeavor subject to extensive governmental regulation, but also both a student-school and an employee-supervisor relationship.  Dr. Pierce was undergoing training in the medical school's emergency medicine residency program, and was in essence both a student and an employee providing professional services to the public.  "In the case of searches conducted by a public employer, we must balance the invasion of the employees' legitimate expectations of privacy against the government's need for supervision, control, and the efficient operation of the workplace." *O'Connor* at 1499.  What the Court said of the railroad employees in *Skinner* is true "in spades" as to Dr. Pierce, practicing and learning emergency medicine, namely that she "discharge[d] duties fraught with such risks of injury to others that even a momentary lapse of attention can have disastrous consequences."  *Id*. at 1419.[9]  Likewise, "the

---

[9]    Physicians are not immune to drug abuse.  Dr. Briones, appellants' expert witness, a current and long-time member (and former chairman) of the El Paso County Medical Society committee dealing with physician substance abuse, testified that drug use was indeed a problem among physicians.  Also, one scientific study of drug and alcohol abuse among physicians reflects that physicians are more likely to use alcohol, benzodiazepine tranquilizers, and opiate analgesics than their age and gender peers in the general public.  Hughes et al., *Prevalence of Substance Use Among U.S. Physicians*, 267 J.A.M.A. 2333, 2336 (May 6, 1992). *See also* Nelson et al., *Substance-Impaired Physicians: Probationary and Voluntary Treatment Programs Compared*, 165 W.J. Med. 31 (July 17, 1996).  The Hughes study also revealed that almost eight percent of physicians admitted to substance abuse or dependence problems at some time in their lives.  *Id*. *See also* Gary Logan, "Stress and Access Make Doctors Vulnerable," *Wash. Post* Sept. 3, 1996, at Z11 (quoting Ronald Dougherty, a specialist in addiction medicine, as stating "[o]ne in six physicians regularly uses opiates, one in nine

substantial need of teachers and administrators for freedom to maintain order in the schools" is a special need such that "the legality of a search of a student should depend simply on the reasonableness, under all the circumstances, of the search." *T.L.O.* at 742.

D.    Privacy expectations; Obtrusiveness

Of course, the fact that "special needs" are present does not alone resolve the matter.   The privacy interests of the party searched must also be weighed in the balance.   "[W]hether a particular search meets the reasonableness standard is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."   *Acton* at 2390 (internal quotation marks omitted). This requires consideration of, *inter alia*, whether the individuals' expectation of privacy is decreased and the relative obtrusiveness or otherwise of the search.  *Id*. at 2396 ("Taking into account all the factors we have considered above—the decreased expectation of privacy, the relative unobtrusiveness of the search, and the severity of the need met by the search . . ."). Dr. Pierce's status as a student-employee in the emergency medicine residency program diminished her legitimate expectations of privacy vis-à-vis the search at issue. "The employee's expectation of privacy must be assessed in the context of the employment relation." *O'Connor* at 1497. "[I]t is plain that certain forms of public employment may diminish privacy expectations even with

---

regularly uses benzodiazepines and sleeping pills, and one in 10 is alcohol-dependent.").

respect to . . . personal searches." *Von Raab* at 1394.  And, as the Court said of Customs employees required to carry firearms or interdict illegal drugs, so also with those similarly situated to Dr. Pierce, "[b]ecause successful performance of their duties depends uniquely on their judgment and dexterity, these employees cannot reasonably expect to keep from the Service personal information that bears directly on their fitness."  *Id.*  "Unlike most private citizens or governmental employees in general," such employees "reasonably should expect effective inquiry into their fitness and probity."  *Id.*[10]

Moreover, the intrusiveness of the search here was entirely minimal.  There is no evidence that anyone observed, listened to, or otherwise monitored the excretion of the urine sample.  The record suggests that Dr. Pierce excreted the sample alone in a bathroom with the door closed.  There is certainly nothing to the contrary, or even to suggest that anyone listened at the door.[11] Moreover, Dr. Pierce took the urinalysis at Pathlab, an independent

---

[10]    *See also Chandler* at 4246:  "railway employers 'by reason of their participation in an industry that is regulated pervasively to ensure safety' had diminished expectations of privacy" (quoting *Skinner* at 1418).

[11]    In *Skinner* and *Von Raab*, the urinalysis testing involved a "monitor of the same sex as the employee remain[ing] close at hand to listen for the normal sounds of urination" or to observe directly as the employee produced the sample.  *Von Raab* at 1388; *Skinner* at 1413.  This type of intrusive monitored testing, which Justice Scalia found "offensive to personal dignity," *Von Raab* at 1398 (dissenting opinion), and which the Court relied on in finding a Fourth Amendment search, *Skinner* at 1413, was not used in the present case.

19

laboratory that she had hand picked herself,[12] without Dr. Smith (or anyone else) being aware that she was going to undergo (or had undergone) such a test, much less at Pathlab, until she turned over the completely negative results to him. There is no evidence that she disclosed to Pathlab any personal medical information, such as what prescription medications she was using. *Von Raab*, 109 S.Ct. at 1394-95 n.2. There is no evidence that the urinalysis was used to look for, or that its results reflected, anything other than the presence or absence of drugs, such as whether Dr. Pierce was "epileptic, pregnant, or diabetic." *Acton*, 115 S.Ct. at 2393. The results of the test were negative for drugs, and thus, so far as the evidence shows, nothing else about Dr. Pierce was disclosed thereby. Moreover, had the results been positive, Dr. Pierce could have elected not to disclose them.

Finally, other circumstances of the test also point to nonintrusiveness. Dr. Pierce did not take the test until approximately nine days after Dr. Robert Smith had requested that she undergo a test as arranged for by him. This factor was deemed important in *Wyman v. James*, 91 S.Ct. 381, 384, 387 (1971) (six days advance notice of requested home visitation of AFDC welfare recipient factor in finding of Fourth Amendment reasonableness), which was cited with approval in this respect in *Von Raab* at 1394 n.2. And, as noted, the test was not undertaken for law enforcement purposes, law enforcement personnel were not involved,

---

[12]    Dr. Pierce testified that she chose Pathlab because "that was the only lab in downtown where I knew I could get that test done independently."

20

and there was no threat of force and no potential criminal or civil penalty for refusing. All these factors were deemed important in *Wyman v. James*. *Id*. at 386-90. Dr. Pierce was orally threatened by Dr. David Smith with dismissal from the residency program if she did not ultimately undergo a drug test arranged by Dr. Robert Smith. However, only the dean of the medical school had the authority to dismiss her (and any dismissal by the dean was subject to suspensive appeal); and, in any event, Dr. Pierce never underwent the test contemplated by the Drs. Smith. Dr. Pierce was *never* tested by anyone acting for any governmental agency or official; and, the wholly noninvasive private test she underwent was not one commanded, requested, or anticipated by any state actor.

All in all, the search here intruded only in the absolutely most minimal way on Dr. Pierce's Fourth Amendment interests; certainly less so than did the searches in *Acton*, *Von Raab*, and *Skinner*. In *Chandler*, the Court observed that the Georgia testing "permits a candidate to provide the urine specimen in the office of his or her private physician; and the results of the test are given first to the candidate, who controls further dissemination of the report," labeled this as "relatively noninvasive," and stated "therefore, if the 'special need' showing had been made, the State could not be faulted for excessive intrusion." *Id*. at 4247.[13] Here, there is plainly no more intrusiveness than in *Chandler*, if,

---

[13]     As previously noted, the holding in *Chandler* then turned solely on the absence of any "special" need, as the need there was in essence merely "symbolic," a desire to "project" a public "image." *Id*.

21

indeed, as much.

E.    Absence of testing policy; Individualized suspicion

Dr. Pierce does not essentially challenge the foregoing analysis, nor does she contend that appellants were required to obtain a warrant or establish probable cause.  Instead, she contends that, as it is undisputed that TTUHSC had no drug testing policy for its physicians or residents, the Fourth Amendment accordingly precluded appellants from telling her she would be dismissed if she did not undergo urinalysis arranged by Dr. Robert Smith, *unless* appellants had reasonable, individualized suspicion that she was using illicit drugs.  The character of reasonable, individualized suspicion which Dr. Pierce contends is necessary appears to be essentially that required for a law enforcement *Terry* stop[14] where the officer's only concern respecting the person stopped is that he may then have drugs.  Dr. Pierce further contends that there was no basis here for that character of suspicion.

However, we conclude that the clearly established law does not now, and did not in March 1990, categorically mandate that sort of reasonable, individualized suspicion for all non-law enforcement, minimally intrusive searches in special needs situations, whenever there was no pre-existing policy authorizing the search.

To begin with, neither the Supreme Court nor this Court has ever articulated such a categorical requirement.  To the contrary, the Court has repeatedly stated:  "the Fourth Amendment imposes no

---

[14]    *See Terry v. Ohio*, 88 S.Ct. 1868 (1968).

22

irreducible requirement of such suspicion," *Acton* at 2391; "neither a warrant nor probable cause, nor, indeed, any measure of reasonable suspicion is an indispensable component of reasonableness in every circumstance," *Von Raab* at 1390; "We have made it clear, however, that a showing of individualized suspicion is not a constitutional floor, below which a search must be presumed unreasonable," *Skinner* at 1417; "the Fourth Amendment imposes no irreducible requirement of reasonable suspicion," *United States v. Martinez-Fuerte*, 96 S.Ct. 3074, 3084 (1976). It is true, of course, that in each of these cases there was some sort of policy. However, in none of these cases did the Court condition its quoted statements with any sort of proviso, such as "so long as there was a general policy pursuant to which the search was conducted" or the like. To the contrary, as further elaborated below, these opinions indicate that whether individualized suspicion may be dispensed with depends on the particular context and a weighing of the invasiveness of the search against the "special needs" presented. Indeed, in *T.L.O.* and also in *O'Connor*, in neither of which was the challenged search conducted pursuant to any general policy, the Court, although sustaining the search after finding reasonable suspicion, went on to *expressly* leave open whether such a finding was necessary to the search's validity. Thus, in *T.L.O.* the Court stated:

> "We do not decide whether individualized suspicion is an essential element of the reasonableness standard we adopt for searches by school authorities. In other contexts, however, we have held that although 'some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure[,] . . . *the Fourth Amendment imposes no irreducible*

23

*requirement of such suspicion* . . . Because the search of T.L.O.'s purse was based upon an individualized suspicion that she had violated school rules, . . . we need not consider the circumstances that might justify school authorities in conducting searches unsupported by individualized suspicion." *T.L.O.* at 743 n.8 (internal citation omitted; emphasis added).

Two years later in *O'Connor* the same approach was taken, *viz*: "Because petitioners had an 'individualized suspicion' of misconduct by Dr. Ortega, we need not decide whether individualized suspicion is an essential element of the standard of reasonableness that we adopt today." *O'Connor* at 1502. What the Supreme Court has expressly left open cannot easily be described as clearly established, particularly as we have never ruled on the matter.

Moreover, Dr. Pierce's categorical approach seems counter to the Supreme Court's context-specific, balancing approach focusing on reasonableness under all the particular circumstances. Thus, in *Chandler* the Court noted that, when "'special needs'" "other than crime detection" were present, whether individualized suspicion was required depended on "a context specific inquiry, examining closely the competing private and public interests." *Id*. at 4246. And, in *Acton* the Court stated:

". . . the ultimate measure of the constitutionality of a governmental search is 'reasonableness.' . . . [W]hether *a particular search* meets the reasonableness standard '"is judged by *balancing* its intrusion on the individual's Fourth Amendment interests against the promotion of legitimate governmental interests."'" *Id*. at 2390 (emphasis added; citations omitted).

. . . .

"It is a mistake, however, to think that the phrase 'compelling state interest,' in the Fourth Amendment context, describes a fixed, minimum quantum of governmental concern, so that one can dispose of a case by answering in isolation the question: Is there a

24

compelling state interest here? Rather, the phrase describes an interest which appears important enough to justify *the particular search at hand*, in light of other factors which show the search to be relatively intrusive upon a genuine expectation of privacy." *Id*. at 2394-95 (emphasis added).

*Skinner* also puts the matter thusly:

". . . the Fourth Amendment does not proscribe all searches and seizures, but only those that are unreasonable. [citation] What is reasonable, of course, 'depends on *all of the circumstances* surrounding the search or seizure *and the nature of the search* or seizure itself.'" *Id*. at 1414 (quoting *United States v. Hernandez*, 105 S.Ct. 3304, 3308 (1985); emphasis added).

*O'Connor* states that for Fourth Amendment purposes "'. . . [w]hat is reasonable depends on the *context* within which *the search* takes place.'" *Id*. at 1498 (emphasis added); quoting *T.L.O.* at 470).

*O'Connor* continues by explaining:

"A determination of the standard of reasonableness applicable to a particular class of searches requires 'balanc[ing] the *nature and quality of the intrusion* on the individual's Fourth Amendment interests *against the importance of the governmental interests* alleged to justify the intrusion.' [citation] In the case of searches conducted by a public employer, we must *balance the invasion of the employees' legitimate expectations* of privacy *against the government's need for supervision, control,* and the efficient operation of the workplace." *Id*. at 1498-99 (emphasis added).

. . . .

". . . [P]ublic employer intrusions on the constitutionally protected privacy interests of government employees . . . should be judged by the standard of *reasonableness under all the circumstances*." *Id*. at 1502 (emphasis added).

Dr. Pierce relies on *Delaware v. Prouse*, 99 S.Ct. 1391 (1979). There, Prouse was indicted for illegal possession of marihuana seized from the car he was riding in when it was stopped by a Delaware police officer who thereafter observed the marihuana in

25

plain view on the car floor. The patrolman stopping the vehicle "had observed neither traffic or equipment violation nor any suspicious activity," and "made the stop only in order to check the driver's license and registration"; he "was not acting pursuant to any standards, guidelines, or procedures pertaining to document spot checks, promulgated by either his department or the State Attorney General." *Id*. at 1394. The only reason given for the stop was "'I saw the car in the area and wasn't answering any complaints, so I decided to pull them off.'" *Id*. The state trial court granted Prouse's motion to suppress the marihuana, "finding the stop and detention to have been wholly capricious and therefore violative of the Fourth Amendment." *Id*. This ruling was affirmed by the Delaware Supreme Court and, ultimately, by the Supreme Court of the United States. The Court observed that it had "only recently considered the legality of investigative stops of automobiles where the officers . . . have neither probable cause to believe nor reasonable suspicion that either the automobile or its occupants are subject to seizure under applicable *criminal* laws." *Id*. at 1397 (emphasis added). It analogized the case before it to *United States v. Brignoni-Ponce*, 95 S.Ct. 2574 (1975), where the Court had rejected the assertion that "Border Patrol agents conducting roving patrols . . . near the international border" could constitutionally "stop at random any vehicle in order to determine whether it contained illegal aliens or was involved in smuggling," and had held that such stops were valid only if based on the reasonable suspicion required for a *Terry* stop. *Prouse* at 1397. The Court noted that both stops such as that in *Prouse* and

26

those in *Brignoni-Ponce* "generally entail *law enforcement officers*" exhibiting "a possibly unsettling show of authority." *Prouse* at 1398 (emphasis added). This was contrasted to the fixed checkpoint stops, upheld in *Martinez-Fuerte*, "where all vehicles are brought to a halt or a near halt, and all are subjected to a show of the police power" and "'the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion.'" *Prouse* at 1398. The Court went on to hold violative of the Fourth Amendment "subjecting every occupant of every vehicle on the roads to a seizure . . . at the unbridled discretion of *law enforcement* officials." *Id*. at 1400 (emphasis added). It explained that "absent reasonable suspicion that the driver is unlicensed or his vehicle unregistered . . . we cannot conceive of any legitimate basis upon which a patrolman could decide that stopping a particular driver for a spot check would be more productive than stopping any other driver." *Id*. The Court observed that it did "not preclude" other "spot checks that involve less intrusion *or* that do not involve the unconstitutional exercise of discretion," and concluded "we hold only that persons in automobiles on public roadways may not for that reason *alone* have their travel and privacy interfered with at the unbridled discretion of *police officers*." *Id*. at 1401 (emphasis added).

Though *Prouse* is doubtless somewhat supportive of Dr. Pierce's contentions, we conclude that it does not suffice to clearly establish that in the present context her Fourth Amendment rights were violated unless Drs. Smith and Binder had such reasonable

suspicion that she was using drugs as would be required for a law enforcement *Terry* stop where the only concern is that the person stopped may then have illegal drugs.

To begin with, as *Prouse* states over and over, it is a law enforcement stop by police case. That is certainly not this case. And that makes a real difference, as explained in *O'Connor*:

> "Even when employers conduct an investigation, they have an interest substantially different from 'the normal need for law enforcement.' [citation] Public employers have an interest in ensuring that their agencies operate in an effective and efficient manner, and the work of these agencies inevitably suffers from the inefficiency, incompetence, mismanagement, or other work-related misfeasances of its employees. Indeed, in many cases, public employees are entrusted with tremendous responsibility, and the consequences of their misconduct or incompetence to both the agency and the public interest can be severe. In contrast to law enforcement officials, therefore, public employers are not enforcers of the criminal law; instead, public employers have a direct and overriding interest in ensuring that the work of the agency is conducted in a proper and efficient manner." *Id*. at 1501.

*O'Connor* goes on to state: "We hold, therefore, that public employer intrusions on the constitutionally protected privacy interests of government employees . . . should be judged by the standard of reasonableness under all the circumstances." *Id*. at 1502. *O'Connor* then expressly declines to "decide whether individualized suspicion is an essential element of the standard of reasonableness we adopt today." *Id*. As the *O'Connor* search was not pursuant to any general policy, and as *O'Connor* was decided after *Prouse*, *Prouse* cannot have clearly established what Dr. Pierce contends it did.

Further, in *Prouse* the Court stressed that there was nothing which distinguished the vehicle stopped from any other vehicle on

28

the highway. In *Skinner*, however, the Court sustained a regulation giving railroad officials *discretion* to select particular employees for drug testing, without individualized suspicion of drug use, provided they had been involved in certain operating rule violations, including noncompliance with a sign and excessive speeding. *Id*. at 1410. Similarly, in *Martinez-Fuerte*, all vehicles had to go through the fixed checkpoint, but "most" went through "without any oral inquiry or close visual examination," being barely stopped or allowed to "merely 'roll' slowly through the checkpoint." *Id*. at 3078 & n.1. "In a relatively small number of cases," vehicles were required to proceed "to a secondary inspection area, where their occupants are asked about their citizenship and immigration status" and at which "the average length of an investigation" was "three to five minutes." *Id*. at 3078.[15] The Court held the selective reference to the secondary inspection area did not have to be made on the basis of any articulable, individualized suspicion. *Id*. at 3078, 3085. Obviously, the intrusion selectively suffered by occupants of the less than one percent of vehicles at the checkpoint which were referred to secondary was far greater than that undergone by all the other vehicles which merely barely stopped or rolled slowly through the checkpoint without any oral inquiry or close visual examination. Nevertheless, the Court concluded that "[a]s the intrusion here is sufficiently minimal . . . no particularized

---

[15]      In one eight-day period, "roughly 146,000 vehicles passed through the checkpoint" and "[o]f these, 820 vehicles were referred to the secondary inspection area." *Id*. at 3081.

29

reason need exist to justify" the referral to secondary. *Id*. at 3085.

Moreover, the presence of a testing policy would not have materially ameliorated the situation from the point of view of one in Dr. Pierce's position. Following *Skinner* and *Martinez-Fuerte*, a presumably permissible policy could have provided that a resident guilty of program misconduct sufficient to justify dismissal—as Dr. Pierce surely was—could, in the discretion of the supervisory program officials as part of their evaluation of whether the underlying misconduct should result in the dismissal of the particular resident, be directed to provide the results of a urine drug test in connection with a psychological evaluation, with the penalty for the underlying misconduct to be dismissal in the event of refusal to furnish the test results. While such a policy would have given Dr. Pierce advance notice that a drug test might be required if she engaged in dismissable program misconduct, the penalty for not providing the drug analysis would simply be that the underlying misconduct would be penalized by dismissal as it could have been whether or not a test was requested and refused, a matter common sense would adequately notify Dr. Pierce of. And, under such a policy, there would be no more discretion than in *Skinner* for discretionary tests for rules violations or in *Martinez-Fuerte* for discretionary referral to secondary inspection.

We conclude that in a situation of this character—a non-law enforcement, employer-school search where there are very special needs and the intrusiveness of the search and the subject's privacy interests are minimal—there is not now, and was not in March 1990,

30

any clearly established Fourth Amendment requirement for either an existing general search policy or individualized suspicion of the type required for a law enforcement *Terry* stop for drug possession. This is not to say that there must not be some legitimate reason for the individual being singled out.[16]  The search must be reasonable under all the circumstances, balancing the individual's privacy interests against the interests of the governmental institution.

III. Qualified Immunity Here

We turn now to the final qualified immunity issue:  would all reasonable state medical school residency program supervisors, similarly situated to Drs. Smith and Binder and with the information they had, have realized that their conduct was unreasonable under all the circumstances, balancing Dr. Pierce's privacy interests against the interests of TTUHSC, and hence invaded Dr. Pierce's Fourth Amendment rights?  On the basis of the undisputed historical facts, we answer this question in the negative.

When Dr. Smith, director of the TTUHSC residency program, learned of the February 22 incident at St. Joseph's in Phoenix, he was objectively faced with what could reasonably be considered as a most serious situation.  Dr. Pierce, one of the TTUHSC residents in its emergency medicine residency program, while on brief

---

[16]    We do not suggest that those in state medical school residency programs may for that reason alone be required, on pain of dismissal, to undergo ad hoc drug testing at the whim and unbridled discretion of program officials having no more reason to single out one resident than another.  But that, of course, is not the situation here.

rotation at St. Joseph's, had slapped an emergency room patient in the face. The patient was about to undergo a CAT scan for a possible internal head injury following an automobile accident in which he had smashed through his car's windshield. He was flat on his back on the CAT scan table, was under restraints, and technicians were holding him down. Dr. Pierce stated that after she tightened his restraints he spat in her face, and she then slapped him, *not* for any therapeutic purpose but in an *impulsive reaction* of surprise or anger. *However*, she slapped him at least twice, three times according to the March 2 letter to Dr. Smith from Dr. Shamos, director of the St. Joseph's trauma center. Dr. Pierce described the slaps as "hard" and "fairly hard." After she had "hard slapped" the patient, Dr. Pierce, who was the only physician present, left the room and washed her face. She returned and approached the patient, whereupon, as she described it, "a nursing supervisor came and grabbed me by the arm and physically pulled me away from" the patient, saying something like "get away from him." Dr. Pierce thereafter remained outside the room, where she was when, some time later, the other physician on duty arrived.

The St. Joseph's administration initially wanted to immediately terminate Dr. Pierce, but she was ultimately allowed to participate in the remaining three days of her rotation, provided she underwent counseling, which she did. The counselor recommended that on her return to El Paso "she contact the University Psychiatric department to continue counseling sessions."

Dr. Pierce, a licensed physician, was in the residency program in order to become a board certified emergency room physician. She

32

admitted the obvious: that she was in the program both to learn and to be taught; that she sought a diploma or certificate from Texas Tech which would in substance attest to her special competence as an emergency room physician; that it was "common to have aggressive patients in the ER" and *not* "a rare occasion" for "a hostile or aggressive patient" to come in; that her slapping the patient was inappropriate; that the practice of medicine "requires that a doctor be able to make calm, rational decisions in life or death situations," and emergency medicine physicians need to be "capable of remaining calm and engaging in rational behavior in the heat of emergency situations" and "able to react calmly and coolly in tough situations"; and that it was appropriate for those in charge of the residency program to assess her ability to do those things, as well as to assess whether she had good interpersonal skills, which would be needed in an emergency room setting, and also to investigate the reasons why she engaged in inappropriate behavior.

This was not the first time Dr. Pierce had come to the unfavorable attention of the TTUHSC faculty and administration. During the previous summer, a faculty committee had found that her "performance was not up to the level of acceptable standards" and she had been placed on probation for, among other things, excessive tardiness, failing to carry an acceptable number of patients, and poor interpersonal relationships with faculty and patients. At that time in 1989 some of the faculty discussed drug use as one of the possible explanations for Dr. Pierce's behavior. Dr. Nelson had even questioned her about drug use, receiving a negative

33

response.[17]    Although her probation had ended before her St. Joseph's rotation—and the St. Joseph's personnel were unaware of it—some of Dr. Pierce's same problems continued.  Dr. Shamos's written evaluation of her at St. Joseph's ranked her in the very lowest category in each of the areas of "Patient Relationships" and "Professional Relationships."

Dr. Smith, as a result of learning of the February 22 incident, placed Dr. Pierce on probation, with pay, pending investigation.  It was determined to have Dr. Pierce undergo a psychiatric evaluation and, in connection with it, a drug urine test.  When Dr. Pierce was informed of this, she objected to the drug analysis.  Dr. Smith told her he would take it up with the faculty, and she was ultimately told by Dr. Smith she would be dismissed if she refused to be tested.[18]  However, Dr. Pierce did not commit herself and no action was taken.  On March 23—some nine days after first being notified of the drug test scheduled for her by Dr. Robert Smith—Dr. Pierce, without any prior notice to anyone at TTUHSC, was tested in a wholly unobtrusive manner by a private laboratory of her own choosing that furnished the results, which were negative, to her only.  After Dr. Smith received this report from Dr. Pierce, and after he also received the psychiatric

---

[17]    In fact, Dr. Pierce testified that she had smoked marihuana prior to or during the summer of 1989 with other TTUHSC residents. However, neither the appellants nor any member of the TTUHSC faculty knew of this in March 1990.

[18]    As noted, Dr. Smith did not have the authority to discharge Dr. Pierce; if she had been discharged by the Texas Tech medical school dean, she would have had appeal and hearing rights before the discharge could have become effective.

evaluations of Dr. Pierce by Dr. Robert Smith and Dr. Salo,[19] Dr. Pierce's probation was lifted.

Objectively, there *was* ample, reasonable basis for singling out Dr. Pierce for special scrutiny and investigation of a kind not applicable to others in the residency program. Dr. Pierce, not long after coming off probation, committed serious professional misconduct in her capacity as a member of the residency program. In light of these occurrences, a decision had to be made as to whether, or under what circumstances, TTUHSC would allow her to remain a part of its emergency medicine residency program. Drug test results—like the psychiatric evaluations—were simply to be one part of that decision-making process, not its ultimate focus or sole determinant. Objectively, something caused Dr. Pierce's behavior in the program to be seriously inappropriate. What things associated with her brought this about? Information in this respect could objectively enhance the reliability of the ultimate decision to be made as to the appropriate future for Dr. Pierce in the residency program.

As we have observed, drug use among physicians has indeed been a problem (see note 9, *supra*). Appellants' expert witness Dr. Briones testified that Dr. Pierce exhibited many of the behavioral problems that are symptomatic of drug use, such as incidents of unprofessional and out-of-character behavior, unexplained absences, and tardiness. *See also* Michael Fleming, *Physician Impairment: Options for Intervention*, 50 Am. Fam. Physician 41 (July 1, 1994)

---

[19]    Dr. Salo was the clinical psychologist selected by Dr. Pierce.

(explaining that substance problem indicators include "changes in work habits, unusual work schedule, a change in prescribing habits, procedural errors, complaints from staff and patients, and severe medical record tardiness"). Drug use, though not objectively shown to be a *likely* cause in Dr. Pierce's case, could at least be reasonably considered as one possible contributing factor, and it was not objectively unreasonable to want some further information which could either confirm or render less likely that possibility. This approach was not necessarily calculated to be detrimental to Dr. Pierce. She could only benefit from a negative drug test. However, she delayed for several days.[20]

We recognize that in order to preclude qualified immunity it

_____

[20]    Dr. Pierce maintains that a drug test would have been too late to shed any light on the February 22 incident. It is true that it was rather unlikely that drugs present then would show up as late as March 17, twenty-three days later, when the test arranged by Dr. Robert Smith was initially scheduled to be performed. But it is not wholly improbable. *See, e.g., Von Raab* at 1396 ("Petitioners' own expert indicated below that the time it takes for particular drugs to become undetectable in urine can vary widely depending on the individual, and may extend for as long as 22 days"; and noting this Court's "reliance on certain academic literature that indicates that testing of urine can discover drug use for . . . weeks after the ingestion of the drug" [internal quotation marks omitted]); 49 C.F.R. § 219.309(b)(2) (1987) ("Because of its sensitivity, the urine test may reveal whether or not you have used certain drugs within the recent past (in a rare case, up to sixty days before the sample is collected) . . . if you provide a blood sample there will be no presumption of impairment from a positive urine test. If you have used any drug off the job (other than a medication that you possessed lawfully) in the prior sixty days, it may be in your interest to provide a blood sample. If you have not made unauthorized use of any drug in the prior sixty days, you can expect that the urine test will be negative; and you may not wish to provide a blood sample"). More importantly, if drugs played a part in Dr. Pierce's behavioral problems, it was not unlikely that she ingested them with some regularity. Finally, this sort of argument was rejected in both *Von Raab* and *Skinner*.

is not necessary that "the very action in question has previously been held unlawful," *Anderson* at 3039, or that the plaintiff "point to a previous case that differs only *trivially* from his case." *K.H. Through Murphy v. Morgan*, 914 F.2d 846, 851 (7th Cir. 1990) (emphasis added). However, the facts of the previous case "do need to be *materially* similar." *Lassiter v. Alabama A&M University*, 28 F.3d 1146, 1150 (11th Cir. 1994) (en banc) (emphasis added). We also recognize that the egregiousness and outrageousness of certain conduct may suffice to obviously locate it within the area proscribed by a more general constitutional rule: "There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages liability . . ." *K.H. Through Murphy* at 851. But the same common sense which informs this teaching likewise prevents its expansion to the point of rendering qualified immunity an insignificant aberration or infringing on the settled doctrine that "[i]t is not enough, to justify denying immunity, that liability in a particular constellation of facts could have been, or even that it was, predicted from existing rules and decisions. . . . Liability in that particular set [of facts] must have been established at the time the defendant acted." *Id*. As the en banc Eleventh Circuit stated in *Lassiter*: "For qualified immunity to be surrendered, pre-existing law must dictate, that is, truly compel (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law *in the circumstances*." *Id*.

37

at 1150. These principles have particular force where, as here, resolution of whether the defendant's conduct violated the constitutional provision sued on is heavily dependent on a balancing or weighing against each other of different factors according to the degree they are present in the matrix of facts constituting the particular context in which the asserted violation occurred. *See, e.g., Gunaca* at 474-75; *Noyola v. Texas Department of Human Resources*, 846 F.2d 1021, 1025 (5th Cir. 1988).[21] *See also Lassiter* at 1150.[22]

Considering that *Skinner* authorized drug tests on a

---

[21] In *Gunaca*, we approvingly described and quoted from our decision in *Noyola*, as follows:

"Because our consideration of such First Amendment claims involves a case-specific balancing of the employee's First Amendment rights and the government's interest in maintaining discipline and efficiency in the work place, [citing *Noyola*], we held that '[t]here will rarely be a basis for *a priori* judgment that the termination or discipline of a public employee violated "clearly established" constitutional rights.'" *Gunaca* at 474 (quoting *Noyola* at 1025).

[22] Thus *Lassiter* states:

"The line is not to be found in abstractions—to act reasonably, to act with probable cause, and so forth—but in studying how these abstractions have been applied in concrete circumstances. [citation and internal quotation marks omitted] And, as the en banc court recently accepted:

'When considering whether the law applicable to certain facts is clearly established, the facts of cases relied upon as precedent are important. The facts need not be the same as the facts of the immediate case. But they do need to be materially similar. [citation] *Public officials are not obligated to be creative or imaginative in drawing analogies from previously decided cases*.'" *Id*. at 1150 (citations omitted).

38

discretionary, ad hoc basis if the employee had been involved in certain rule violations but without further individualized suspicion, that that principle had not (and has not) been held by the Supreme Court or this Court to be dependent on the prior existence of a rule so providing, and that objective factors distinguished Dr. Pierce from other residents in the program so that she was not singled out arbitrarily or capriciously, and considering also the minimal intrusiveness and extent of the invasion of Dr. Pierce's Fourth Amendment interests and the legitimate special needs of the medical school program where she was a student-employee, we conclude that Drs. Smith and Binder are entitled to qualified immunity as a matter of law. The question is not whether other reasonable or more reasonable courses of action were available. It is, rather, whether of medical school officials similarly situated to Drs. Smith and Binder "all but the plainly incompetent" would have realized at the time that what they did violated Dr. Pierce's Fourth Amendment rights. *Hunter* at 537; *Blackwell* at 304. Under the circumstances, that question must be answered in the negative.

## Conclusion

We hold that appellants are entitled to qualified immunity as a matter of law. The judgment of the district court is accordingly reversed, and the cause is remanded with directions to enter judgment for appellants.

REVERSED

39

ENDRECORD

DENNIS, Circuit Judge, dissenting.

I emphatically disagree with the majority's conclusion that the state attorney general has shown that this case falls within the closely guarded "special needs" category recently recognized by the Supreme Court within which a state officer without reasonable individualized suspicion of wrongdoing may require a person to submit to an urinalysis drug test. In this case state medical school administrative officers, without reasonable individualized suspicion that a physician-resident trainee's urine contained evidence of illegal drug usage (and in the absence of any established drug testing policy) ordered her to submit to an urinalysis drug test, on pain of termination of her employment, residency training, and severe or fatal damage to her medical professional career. The state attorney general concedes that the state compelled drug test effected a search within the meaning of the Fourth and Fourteenth Amendments. See Defendants-Appellants' Brief p. 11. Both the currently applicable law, and the clearly established law at the time the state officers ordered the physician-resident to submit to urinalysis drug testing (March, 1990), require that a state officer have an individualized reasonable suspicion that illegal drug use evidence is contained in a person's urine before ordering her to submit to an urinalysis drug test. The majority's erroneous conclusion that the state's proffered "special need" for drug testing justified the suppression of the Fourth Amendment's normal requirement of individualized suspicion led to its mistaken reversal of the district court's judgment implementing jury awards to the plaintiff of compensatory

41

and punitive damages.  Accordingly, I respectfully dissent.

## I. Issues On Appeal

On appeal, the state attorney general, on behalf of the defendants-appellants, assigns and argues for reversal of the district court's judgment and the plaintiff's jury-awarded damages on four issues: (1) The district court erred in denying defendants' motion for judgment as a matter of law because no individualized suspicion was required to justify the defendants in  compelling Dr. Pierce to submit to an urinalysis drug test; (2)  Alternatively, the district court erred in not granting defendants' motion for judgment as a matter of law because reasonable minds could not differ that the defendants had reasonable grounds to suspect that Dr. Pierce was using illegal drugs at the time she was ordered to submit to an urinalysis; (3) The district court erred in denying defendants' motions for summary judgment and judgment as a matter of law because at the time the defendants ordered Dr. Pierce to take the drug test the law was not  clearly established that an individualized reasonable suspicion of wrongdoing was required before a state officer could order a public employee or public professional school student to submit to an urinalysis drug test; and (4) The district court erred in denying  judgment as a matter of law on the question of punitive damages.

That the state officers' actions invaded an expectation of privacy that society is prepared to recognize as reasonable is not disputed.  The state attorney general, on behalf of the defendants-appellants, expressly does "not contest that whether the actions that were taken constituted a 'search' within the meaning of the

Fourth Amendment."  Defendants-Appellants' Brief p. 11.

## II. Analysis of Overlapping Issues

<u>Issues 1. & 3.  The clearly established law now and always has required that state officers have at least reasonable individualized suspicion of wrongdoing before ordering a free adult person to submit to an urinalysis drug test.</u>

The currently applicable law and the clearly established law at the time the state officers ordered the physician-resident trainee to submit to urinalysis in  March, 1990 require that a state officer have an individualized reasonable suspicion that a person's urine contains evidence of  illegal drug use before ordering her to submit to an urinalysis drug test.  In 1989, the Supreme Court, in *Skinner v. Railway Labor Executives Ass'n.*, 489 U.S. 602 (1989) and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), recognized a "special needs" category of cases involving train operators and Customs Service agents and permitted suspicionless government mandated urinalysis of such persons under the particular and unique  circumstances and regulated drug testing programs in those cases.   Previously, Supreme Court Justices, in dicta and separate opinions, had spoken of "special needs" in contexts other than urinalysis drug testing but clearly had not designated a "special needs" category for suspicionless searches or seizures.  Subsequent to *Skinner* and *Von Raab* the Supreme Court, in *Vernonia School District 47J v. Acton,* 115 S.Ct. 2386 (1995), recognized a "special needs" category for suspicionless random sample  urinalysis  of  secondary  school  athletes  with  parental

43

consent under the particular, unique circumstances and detailed written drug-testing policy in that case.  Recently, in *Chandler v. Miller*, ---U.S.---, 117 S.Ct. 1295 (1997), the Supreme Court held that a state's statutory requirement that candidates for state office submit to an urinalysis drug test does not fit within the closely guarded "special needs" category of constitutionally permissible suspicionless searches established by *Skinner*, *Von Raab* and *Vernonia* and that those precedents remain the guides for determining whether any proffered "special needs" for suspicionless drug testing passes constitutional muster.  In the present case, it is clear that the state officers' order that the adult physician-resident trainee submit to urinalysis drug testing, which was not based on reasonable individualized suspicion, did not fit within the closely guarded "special needs" category of constitutionally permissible suspicionless searches, because the ad hoc drug test order was not supported by an established drug testing program or a showing of any of the factors necessary to justify a "special needs" category and suspicionless drug testing policy or program.

<u>A. Overview, Including  The  Law At
The Time Of The Urinalysis Drug Test
Order In The Present Case And Prior
Thereto</u>.

The Fourth Amendment provides:

   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported

44

by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Until the late 1960's, the steadfast rule was that in order for a search to be "reasonable," law enforcement officials must first obtain a warrant from a neutral and detached magistrate by establishing probable cause that a law had been violated; and that in the few specific situations in which obtaining a warrant was deemed impracticable probable cause was still required. *See, e.g., Carroll v. United States*, 267 U.S. 132 (1925); *Agnello v. United States*, 269 U.S. 20 (1925). As the Supreme Court considered nontraditional applications of the Fourth Amendment, however, such as searches by public inspections officials, *See Camara v. Municipal Court*, 387 U.S. 523 (1967), and frisks by police officers, *Terry v. Ohio*, 392 U.S. 1 (1968), it found it needed more flexibility than the warrant and probable cause requirements could provide. The Court began, in limited circumstances, to recognize specific permissible departures from the traditional probable cause requirement, after "balancing the need to search against the invasion which the search entails". *Camara*, 387 U.S. at 537; *See Terry*, 392 U.S. at 21. The departures have been of two different kinds: (1) those requiring only reasonable individualized suspicion; and (2) those requiring no individualized suspicion but only a random or other nonarbitrary selection process. *See* Wayne R. LaFave, *Computers, Urinals, and Fourth Amendment: Confessions of a Patron Saint*, 94 MICH. L. REV. 2553, 2575-1576 (1996)[hereinafter

45

LaFave]; *Cf. Terry v. Ohio, supra*, and *Camara v. Municipal Court, supra*.

Each situation in which the Supreme Court has created an exception that allows an intrusion without reasonable individualized suspicion is markedly different from the state mandated urinalysis test situation in the present case. In comparison, each of those cases is clearly distinguishable from the present case on one or more of the following grounds: (1) the nature of the intrusion was much less severe; (2) the magnitude of the governmental need for the search was far greater; and/or (3) it was impracticable or impossible to respond to the governmental need with the individualized suspicion requirement. *See* LaFave at 2577. (citing and referencing cases).

For example, the premises inspection cases do not involve a serious intrusion upon personal privacy because even the housing inspections, and especially the business inspections, are not "personal in nature." *Camara*, 387 U.S. at 537. The concern of the inspector is directed toward such facilities as the plumbing, heating, ventilation, gas and electrical systems, and toward the accumulation of garbage and debris, and there is no rummaging through private papers and effects of the householder. By comparison, the type of search at issue in the present case is very personal in nature, intruding upon "an excretory function traditionally shielded by great privacy." *Skinner*, 489 U.S. at 626; LaFave at 2577-2578.

The present case is distinguishable from the "special needs" urinalysis cases, and from other Fourth Amendment cases, in which

searches without individualized suspicion were permitted, because those cases involved far greater magnitudes of risks. The searches in those cases were responsive to situations in which even one undetected instance of wrongdoing could have injurious consequences for a great number of people: as in the case of building inspections, even a single safety code violation can cause fires and epidemics that ravage large urban areas. *Camara*, 387 U.S. at 535; as in airport screening, where even a single hijacked plane can result in the destruction of hundreds of human lives and millions of dollars of property. *United State v. Edwards*, 498 F.2d 496, 500 (2d Cir. 1974); as in particular comprehensive drug-testing programs, in *Skinner* for example, where a single drug-impaired train operator could produce disastrous consequences including great human and property loss, *Skinner*, 489 U.S. at 628; in *Von Raab*, where a customs official using drugs could cause the noninterdiction of a sizable drug shipment and consequently injury to the lives of many, and perhaps a breach of national security, *Von Raab* 489 U.S. at 670, 674.; and in *Vernonia* in which the significant  government interest in a drug free secondary educational and athletic environment has a national impact of great magnitude on vast numbers of school children who are not free adults but are under the guardianship of public school districts throughout the country. *Vernonia Sch. Dist. 47J v. Acton*, ---U.S.---, 115 S.Ct. 2386 (1995); See LaFave at 2578.

Most important of all, the cases allowing a search without individualized suspicion upheld the suspicionless searches only after recognizing the Fourth Amendment's general rule requiring at

least reasonable individualized suspicion, and then pointed to sound reasons why that standard would be unworkable under the unusual circumstances presented. In *Camara*, the court emphasized that an individualized suspicion test was impracticable for safety inspections because evidence of code violations ordinarily was not observable from outside the premises. *Camara*, 387 U.S. at 537. Suspicionless searches of prisoners after contact visits are permissible precisely because the extent of scrutiny necessary to obtain individualized suspicion would cause obvious disruption of the confidentiality and intimacy that these visits are intended to afford. *Bell v. Wolfish*, 441 U.S. 520, 560 n.40 (1979) In *Skinner*, requiring individualized suspicion for testing train operators after an accident was not feasible because "the scene of a serious rail accident is chaotic." *Skinner*, 489 U.S. at 631. In *Von Raab*, the suspicion requirement for testing customs officials was impractical because it was "not feasible to subject [such] employees and their work product to the kind of day-to-day scrutiny that is the norm in more traditional office environments." *Von Raab*, 489 U.S. at 174. The border search and airport search cases are obviously distinguishable because in each the authorities are in a now-or-never situation as to large numbers of travelers who could not feasibly have been subjected to prior unintrusive scrutiny. *See, e.g., United States v. Ramsey*, 431 U.S. 606 (1977); *United States v. Moreno*, 475 F.2d 44 (5th Cir. 1974); LaFave at 2578-2579.

By contrast, there is no comparable justification or precedent for allowing the state medical school administrative officers in

48

the present case to order physician-resident trainee drug tests without individualized suspicion.  Each relatively small group of residents is under constant supervision and/or observation by veteran doctors, nurses, hospital workers, administrators and peers.  In this case, Dr. Pierce was one of only six residents in Texas Tech's emergency medicine program.  Plainly, there has been no showing that the reasonable individualized suspicion test would likely be ineffectual under the circumstances of the Physician-residents' employment and training.

## B. The Pre-Skinner Urinalysis Cases

Prior to *Skinner v. Railway Labor Executive's Ass'n.*, 489 U.S. 602 (1989), and *National Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989), the consensus of courts, which ruled upon the validity of urine tests for public employees required as a prerequisite some articulable basis for suspecting that the employee was using illegal drugs, usually framed as "reasonable suspicion."  *See* 4 LaFave, SEARCH AND SEIZURE--A TREATISE ON THE FOURTH AMENDMENT, §103(e), p.498 (3d ed. 1996)(citing cases at n.180); Miller, *Mandatory Urinalysis Testing and the Privacy Rights of Subject Employees: Toward a General Rule of Legality Under the Fourth Amendment*, 44 U.PITT.L.REV. 201, 218-230 (1986)(discussing cases).  "[V]irtually all the reported cases...concluded that such testing is unconstitutional in the absence of some reasonable individualized suspicion."  *Fraternal Order of Police v. City of Newark*, 524 A.2d 430, 436 (N. J. 1987)(The "reasonable

49

individualized suspicion test fairly accommodates the legitimate interest of employee privacy without unduly restricting the public employer's opportunity to monitor and control the use of drugs by employees.")

There were exceptions to this general rule for positions involving some unusually pressing public safety or security concerns, such as correctional officers in direct contact with dangerous prisoners, utility employees with access to vital areas of nuclear power plants, or narcotics officers with dangerous undercover assignments. But suspicionless testing was generally rejected for public employees with less unusual responsibilities, including ordinary police officers. Schulhofer, *On the Fourth Amendment Rights of the Law-Abiding Public*, 1989 SUP. CT. REV. 87, 129-130 (1990)(citing cases).

C. The Majority's Mistaken Reliance
On Pre-Skinner "Special Needs" Dicta
In Inapposite Non-Drug Test Cases

The Supreme Court did not actually establish and apply the "special needs" category permitting suspicionless urinalysis drug-testing of certain types of employees until 1989 in *Skinner* and *Von Raab.* Previously, the Supreme Court Justices had spoken of "special needs" in dicta and in a separate opinion in a few cases that did not involve drug testing or a personal privacy invasion as serious as the compelled collection and analysis of a person's urine. Moreover, the Supreme Court in those cases upheld the search or seizure as having been based upon a reasonable

50

individualized suspicion.

In *New Jersey v. T.L.O.*, 469 U.S. 325 (1985), the Court found that a teacher's report that a high school student had been smoking on school premises contrary to rules amounted to a reasonable suspicion that the student's purse contained cigarettes. In *O'Connor v. Ortega*, 480 U.S. 709 (1987), the Court found that charges of specific improprieties gave an employer the individualized suspicion of employment related sexual and other misconduct of Dr. Ortega to justify a search of his desk on government premises. In *Griffin v. Wisconsin*, 483 U.S. 868 (1987), the Court found that the tip received by a police officer that a probationer was storing guns in his apartment provided reasonable suspicion of wrongdoing.

The majority opinion's attempt to characterize these cases as representing the establishment of expansible "special needs" categories prior to and unlimited by *Skinner, Von Raab and Vernonia,* is untenable. The majority's reasoning is not only inconsistent with the *Skinner* trilogy, it is based entirely on dicta and it completely disregards the incongruous subject matter and holdings of those decisions as well as other statements contradictory to its thesis in the opinions. *See Griffin*, 483 U.S. at 876; *O'Connor*, 480 U.S. at 726; *T.L.O.*, 469 U.S. at 342 & n.8.

### D. The Currently Existing Law

The Supreme Court in its most recent urinalysis drug test

case, reaffirmed that the Fourth Amendment requires the government to respect the right of people to be secure in their persons against unreasonable searches and seizures, and that to be reasonable under the Fourth Amendment, a search ordinarily must be based on individualized suspicion of wrongdoing. *Chandler v. Miller*, 117 S.Ct. 1295, 1298 (1997)(*citing Vernonia School Dist. 47J v. Acton*, 115 S.Ct. 2386, (1995)). However, in limited circumstances, where the privacy interests implicated by the search are minimal, and where an important governmental interest furthered by the intrusion would be placed in jeopardy by a requirement of individualized suspicion, a search may be reasonable despite the absence of such suspicion. *Chandler*, 117 S.Ct. at 1298, (*quoting Skinner*, 489 U.S. at 624); *see also Von Raab*, 489 U.S. at 665-66.

The court clearly indicated that *Skinner and Von Raab* must be read in their unique contexts. *Skinner* concerned Federal Railroad Administration (FRA) regulations that required blood and urine tests of rail employees involved in train wrecks. The FRA adopted the drug-testing program in response to evidence of on the job drug and alcohol abuse by railroad train crews, the enormous safety hazard posed by such abuse, and the documented nexus between impaired employees and the incidence of train accidents. Factors tending to offset the privacy concerns were that the regulations reduced intrusiveness; the fact that the industry was regulated pervasively for safety diminished privacy expectations; the surpassing safety risks and interests; the illegal drug and alcohol use by rail employees could cause great human loss before signs of impairment were noticeable to supervisors; the program helped

52

obtain invaluable information about major train wreck causes and; an individualized suspicion requirement in the chaotic aftermath of a train accident would impede detection of causation. *See Chandler*, 117 S.Ct. at 1301.

In *Von Raab*, drug interdiction had become the Customs Service's primary enforcement mission; the covered posts directly involved drug interdiction or otherwise required Customs officers to carry firearms; the employees had access to vast sources of contraband; officers had been targets and some had succumbed to bribery; and it was not feasible to subject Customs Service employees to the kind of day to day scrutiny that is the norm in more traditional work environments. *Chandler*, 117 S.Ct. at 1301-02.

In *Chandler* the Supreme Court also pointed out the set of unique circumstances in *Vernonia School District 47J v. Acton*, 115 S.Ct. 2386 (1995), under which it had sustained a random sample drug-testing program for high school students engaged in inter-scholastic athletics, with written consent of each athlete's parents, during the season of each sport: public school systems bear large responsibilities as "guardian and tutor" of children entrusted to their care; there was an "immediate crisis" caused by a sharp increase in drug use in the school district; student athletes were leaders of the drug culture; students within the school environment have a lesser expectation of privacy than members of the population generally; it is important to deter drug use by school children and to reduce the risk of injury caused by drug use among student athletes. *Chandler*, 117 S.Ct. at 1302.

According to the *Chandler* court*, Skinner*, *Von Raab* and

*Vernonia* establish that the government's "proffered special need for drug testing must be substantial--important enough to override the individual's acknowledged privacy interest, sufficiently vital to suppress the Fourth amendment's normal requirement of individualized suspicion." *Chandler*, 117 S.Ct. at 1303. The Supreme Court in *Chandler* rejected the state's invitation to apply a more deferential framework, stating that "[o]ur guides remain *Skinner, Von Raab, and Vernonia*." *Id*. at 1302.

Before Chandler, it was already very clear that the present case does not fit into the *Skinner-Von Raab-Vernonia* "Special Needs" category. For the reasons previously discussed, the present case is clearly distinguishable from other cases allowing suspicionless searches or seizures in terms of the nature of the intrusion, the magnitude of risks to human lives and property, and/or the practicability of application of the reasonable individualized suspicion test. Chandler confirms, however, that, in the present case, the governmentally proffered special need for suspicionless drug testing has not been demonstrated to be real, substantial or sufficiently vital to suppress "the Fourth Amendment's normal requirement of individualized suspicion[,]" *Id*. at 1300, 1303, when measured by "[o]ur guides...*Skinner, Von Raab*, and Vernonia." *Id*. at 1303.

First, the state government in the present case has not established by legislated law or legislatively authorized government regulation any need, system or procedure for the suspicionless drug testing of physicians in hospital residency programs. In *Skinner, Von Raab and Vernonia*, the urinalysis tests

54

were administered pursuant to well defined programs established by governmentally promulgated regulations or written policy statements based on documented needs, not by purely ad hoc decisions guided only by untrammeled supervisory discretion, as in the present case. In *Vernonia*, the drug testing was also authorized by the written consent of the parents of each student-athlete.

Second, there has been no demonstration here that public safety is genuinely in jeopardy or that there is a critical and immediate need to suppress the Fourth Amendment's normal requirement of individualized suspicion.

Unlike the situation presented in *Skinner*, the record here indicates that neither the government nor the medical school had established a drug-testing program of any kind for resident physicians. Consequently, there were no regulations, guidelines or procedures established for drug testing. Moreover, prior to the state officer's drug-test order, the medical school had undertaken no systematic study of drug abuse by residents. Consequently, the school had not established a documented link between drug abuse by residents and any medical accident. Further, the record does not reflect that residents participate in an industry that is regulated pervasively to ensure safety; the practice of medicine, like that of law, is a profession, which is largely self-governed by its own ethical and disciplinary system. There was no indication of a surpassing safety interest in guarding against the risk that residents would cause loss of large numbers of human lives and millions of dollars of property damage due to drug use before any signs of impairment would become noticeable to supervisors. Of

55

course, because there was no drug-testing program and no history of drug-related medical accidents in the residency program, it cannot be argued that any valuable medical data had been derived from urinalysis. There was no evidence that the individualized suspicion requirement for a drug test of resident physicians would seriously impede the employer's ability to identify and eliminate or rehabilitate drug-impaired residents.

By the same token, the present case, in contrast with *Von Raab*, does not relate to the use of drug tests as a condition of promotion or transfer. Also, of course, it does not involve employees exposed to the vicissitudes of illicit drug smuggling and interdiction, firearm usage, exposure to narcotics sources, bribery, and blackmail.

Finally, the present case, which is quite distinguishable from *Vernonia,* involves free adult physicians working and training in a hospital resident program, not high school and junior high school student athletes to whom the public school system owed a duty as guardian and tutor to protect from moral corruption and physical injury due to drug use during an immediate crisis caused by a sharp increase in drug use in the school district.

In sum, under the current law, as under the clearly established law at the time of the state officer mandated drug test, the record in the present case is notably lacking in the presentation of a concrete danger demanding departure from the Fourth Amendment's main rule that, to be reasonable under the Fourth Amendment, a search must be based on individualized suspicion. *See Chandler*, 117 S.Ct. at 1303.

56

<u>Issues 2. and 3.   The District Court Correctly Denied the State
Officers' Motions For Summary Judgment And Judgment As A Matter Of
Law.   The Officers Were Not Entitled To Qualified Immunity Because
A Reasonable Officer Would Have Known The Drug-Test Order Was
Unlawful Due To An Absence Of Reasonable Individualized Suspicion.</u>


Under 42 U.S.C. § 1983, every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state, subjects, or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.   Therefore, when a state officer acts under a state law in a manner violative of the Federal Constitution, he comes in conflict with the superior authority of that Constitution, and he is in that case stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct.  *Scheuer v. Rhodes*, 416 U.S. 232, 237 (1974) Although § 1983 on its face admits of no immunities, the Supreme Court has read it in harmony with general principles of tort immunities and defenses rather than in derogation of them.  *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)   In the absence of congressional directions to the contrary, however,  it is untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials.  *Malley v. Briggs*, 475 U.S. 335, 340, n. 2 (1986);  *Butz v. Economou*, 438 U.S. 478, 504 (1978); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, n.

57

30 (1982).

The Supreme Court cases have generally provided government officials performing discretionary functions with a qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated. *Anderson v. Creighton*, 483 U.S. 635, 638-639 (1987) (citing *Malley v. Briggs*, 475 U.S. 335 (1986)); *Mitchell v. Forsyth*, 472 U.S. 511 (1985); *Davis v. Scherer*, 468 U.S. 183 (1984); *Harlow v. Filtzgerald* 475 U.S. 800 (1982). Whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time it was taken. *Anderson v. Creighton*, 483 U.S. at 639 (quoting *Harlow*, 457 U.S., at 818-819.

Moreover, the right that the official is alleged to have violated must have been "clearly established" in a sufficiently particularized and relevant sense: "<u>The contours of the right must</u> <u>be sufficiently clear that a reasonable official would understand</u> <u>that what he is doing violates that right.  This is not to say that</u> <u>an official action is protected by qualified immunity unless the</u> <u>very action in question has previously been held unlawful, *see*</u> <u>*Mitchell, supra*, 472 U.S., at 535, n. 12, 105 S.Ct., at 2820, n.</u> <u>12; but it is to say that in the light of pre-existing law the</u> <u>unlawfulness must be apparent. *See, e.g., Malley, supra*, 475 U.S.,</u> <u>at 344-345, 106 S.Ct., at 1097-1098; *Mitchell, supra*, 472 U.S., at</u>

58

528, 105 S.Ct., at 2816; *Davis, supra*, 468 U.S., at 191, 195, 104 S.Ct., at 3017, 3019." *Anderson*, 483 U.S. at 639. (emphasis added).

As demonstrated above, the clearly established law at the time the state officers ordered the physician resident-trainee to submit to an urinalysis drug test required that the officers have individualized reasonable suspicion that she had used illegal drugs and that evidence of such usage could be detected in her urine. Therefore, the contours of the physician-resident's Fourth Amendment right were sufficiently clear that reasonable officials would understand that before ordering the collection and analysis of her urine, on pain of terminating her employment and residency training, they must have reasonable individualized suspicion, *i.e.*, something more substantial than inarticulate hunches, that she had consumed drugs and that evidence of that usage could be detected by urinalysis.

Applying these principles, in the light of the pre-existing law a reasonable official would understand that ordering her to submit to urinalysis violated her right to privacy because the meager information available could not give rise to a reasonable individualized suspicion that her urine contained the evidence of illegal drug usage. The doctors on the scene when she slapped the unruly, amphetamine-drugged patient immediately after he spat in her face did not think her reaction was drug induced or influenced. Approximately one month elapsed between this incident and the officers' order that she submit to a monitored urinalysis test or be removed from the residency program. The record is devoid of any

59

evidence even slightly suggesting drug usage by her between the slapping incident and the officers' drug test ultimatum. Under all of the circumstances, the absence of any basis for reasonable individualized suspicion and the resulting unlawfulness of the officers' drug test order were clearly apparent.


Issue 4. The Officers Failed To Preserve The Issue Of Insufficiency Of Evidence To Support A Punitive Damages Award For Our Review.

A post-verdict motion under Rule 50(b) for judgment as a matter of law cannot be made unless a previous motion for judgment as a matter of law was made by the moving party at the close of all the evidence. Rule 50(b); *In re Owners of "Harvey Oil Center*," 788 F.2d 275, 278 (5th Cir. 1986); *Quinn v. Southwest Wood Products*, Inc., 597 F.2d 1018, 1024 (5th Cir. 1979). Because the defendants-appellants failed to move at the close of all the evidence for judgment as a matter of law on the issue of the sufficiency of evidence as to punitive damages, that issue has not been preserved for our review.